UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

COLE SCOTT,                                    )
                                               )
                        Plaintiff,             )
                                               )
        vs.                                    )   CAUSE NO. 2:21-CV-117-PPS-JEM
                                               )
CITY OF LAKE STATION, INDIANA, *et al.*,       )
                                               )
                        Defendants.            )

## OPINION AND ORDER

Cole Scott is a former employee of the City of Lake Station who was fired on February 23, 2021, several months after he tested positive for COVID-19 and after missing a number of work weeks due to illness. The twelve-count second amended complaint is a blunderbuss which includes claims under the Family Medical Leave Act (FMLA) (both interference and retaliation), violation of the Families First Coronavirus Response Act (FFCRA), other retaliation claims, breach of a collective bargaining agreement (CBA) and of the duty of fair representation, intentional infliction of emotional distress, constructive discharge, and violations of the Americans with Disabilities Act (ADA).

There are a number of defendants in this case. They have arranged themselves into two groups, both groups filing a motion to dismiss. The first group is the "Union Defendants" which are comprised of Defendants American Federation of State County and Municipal Employees of Indiana/Kentucky 962 Local 3379 ("the Union"), and Cassandra Stigger (the union representative). The second group is the "City

Defendants" made up of City of Lake Station, Indiana, William Carroll, Kevin Sowash,

Adrian Vera, and unknown supervisors and managers of City of Lake Station, Indiana.

Regarding the Union Defendants' motion to dismiss, Scott concedes that Counts

I-VI should be dismissed, which I will do without prejudice. As for Counts VII and VIII

which relate to an alleged breach of the CBA and the Union's duty of fair

representation, that claim must be dismissed because the operative statute specifically

excludes CBAs with governmental entities.  So Counts VII and VIII will be dismissed

with prejudice as to the Union Defendants.  As for the City Defendants' motion to

dismiss, it will be denied.

### Background

This case involves a real world example of what havoc COVID-19 has wreaked in

the workplace, both for the employer and the employee.  The facts are taken from the

complaint, which I accept as true at this point.  Many of the facts set forth in the

operative complaint come from laborious text messages between Scott and his

supervisor, Kevin Sowash.  You'll note that the facts set out below are quite lengthy.

This is because Scott has not paid heed to Rule 8 which requires that a complaint only

contain a "short and plain statement" which shows an entitlement to relief.  Fed. R. Civ.

P. 8(a)(2).

Beginning in August 2018, Scott worked full-time as a Street Department Laborer

for Lake Station. [Sec. Am. Compl., DE 37, at 3.]  He was paid an hourly rate.  *Id.*

During his employment, he was a member of Local 3379.  *Id.*  There was a Collective

Bargaining Agreement between the City of Lake Station and Local 3379. [*Id.* at 15.] Defendant Stigger was a union representative for Local 3379. [*Id.* at 3.]

On November 12, 2020, Scott texted defendant Sowash (his supervisor), and told him that he felt ill and was going home. [*Id.*] Scott got tested for COVID-19 that same day. *Id.* Scott missed worked the next day too. [*Id.* at 4.] On November 13th, he texted Sowash and told him his parents had COVID and he was awaiting his test results. *Id.* The next day, November 14, 2020, Scott texted Sowash that he still did not feel well, he had lost his taste, and had muscle pain. *Id.* Scott learned on November 14th that he tested positive for COVID-19, and forwarded the test results to Sowash. *Id.*

Sowash checked in on Scott on November 18, 2020. *Id.* Scott texted Sowash that he was exhausted, coughing a lot, and using the bathroom a lot. *Id.* On November 24, 2020, Sowash and Scott exchanged texts - Scott indicated he was still coughing and having bad migraines, and said he would get further COVID-19 testing at the end of the week. *Id.* Sowash tried to get Scott to go to a particular testing site, and told Scott they only "have two guys on the street." *Id.* Scott responded that he felt more comfortable going to his own doctor and to the hospital to get tested. *Id.*

A few days later, on November 28, 2020, Sowash texted Scott "see you Monday." [*Id.* at 5.] Scott responded that he did not have his test results back yet, he was still having symptoms, and was still sick. *Id.* On November 30, 2020, Scott texted Sowash that he received his test results, he was still positive, and he sent the results to Sowash. *Id.*

On December 2, 2020, Scott called and texted Stigger (his union representative), for guidance. *Id.* According to Scott, she did not call him back. *Id.* Scott also alleges that same day he told Sowash that he had "just talked to his doctor, CDC, and Stigger, and 'they said I have to go get tested next week on the 11th and I can't come back to work positive' or with symptoms." *Id.* Sowash didn't respond. *Id.*

Several events happened next on December 7, 2020. Scott sent Stigger his doctor's note, signed by a nurse practitioner, which indicated Scott was evaluated that day, he should remain off work due to ongoing symptoms, and would be reevaluated in one week. *Id.* Stigger responded, asking Scott to make sure that Sowash and Vera (another supervisor of Lake Station employees) get a copy, so Scott sent the note to them too. *Id.* Sowash responded to the text, stating Scott is one of the first people he knows who was "having problems this long that isn't old or has other health problems." *Id.*

On December 11, 2020, several more things happened to advance the facts in this case. Scott called Stigger who answered, said she would call him back in 30 minutes, but then said she was having phone trouble and did not call him back. *Id.* Scott also texted Sowash on December 11th that he was still experiencing symptoms – he was still coughing and his breathing was not 100%. *Id.* Scott also notified Sowash that his doctor gave him steroids for his lungs, he had to give it a few days to see if the medication would help, and he was aiming to return to work on Wednesday. [*Id.* at 6.] Sowash responded, "OK as long as you have a doctor's note it is what it is lol." *Id.*

4

Later that same day (still on December 11, 2020), Sowash texted Scott and asked him if he filed for unemployment. *Id.* Scott texted back that he did apply for unemployment since he has COVID and was off more than two weeks. *Id.* Sowash responded, "well just because you had covid does not mean you are entitled to unemployment you were paid for two weeks." Scott texted back, indicating the unemployment office told him he was eligible for unemployment because he had been paid for two weeks, but he was off work for more than two weeks. *Id.* Scott alleges that Sowash then retaliated against him, stating "just to let you know we denied the claim and I do not know where [it] is going from there." *Id.*

Scott also claims that Sowash chastised him for filing unemployment. Sowash texted him, "I don't understand why you would do that man . . . the mayor did not have to pay anyone since this started [] when everyone got paid for not working at all for three weeks then got paid for every other day for who knows how long . . . even now he don't have to pay the two weeks for covid. But regardless we will be fighting this to the fullest." *Id.* However, Sowash also informed Scott that he "can have as many days as needed unpaid as long as you have a doctor's note and obviously it won't count against you." *Id.*

On Monday December 14, 2020, Scott had a doctor's appointment. *Id.* He told Sowash that same day that his symptoms hit him again, and he would miss the rest of the week. [*Id.* at 6-7.] Two days later, on December 16, 2021, Sowash texted Scott, asking if he would be back on Monday. [*Id.* at 7.] Scott said no, and that he would

5

return when he was better. *Id.* Sowash told Scott that he needed something from his doctor. *Id.* Pursuant to Sowash's request, on December 18, 2020, Scott sent Sowash and Stigger the doctor's note, which verified the December 14, 2020 appointment and that Scott should remain off work due to ongoing symptoms. *Id.*

Sowash texted Scott on December 22, 2020, asking him if he was coming back the following week. *Id.* Scott told him his next doctor's appointment was on January 4, 2020. *Id.* Sowash stated he had been getting a lot of questions "because you have missed over 40 days and you are negative for covid now." *Id.* Scott responded that he was up and moving, but his body was weak, and he was trying to recover from shortness of breath. *Id.* Scott also told Sowash that people could contact his doctor and the CDC. *Id.* It seems that Sowash didn't take too kindly to this latest text, and he told Scott he was giving him "a heads up to do what you need to do to get back to work because honestly it is not looking good." [*Id.* at 8.] Scott then directly asked Sowash if Lake Station was trying to fire him. *Id.* Changing the subject, Sowash asked how Scott's parents and girlfriend were doing. *Id.*

On January 4, 2021, Scott had a doctor's visit with a nurse practitioner. *Id.* He was referred to a pulmonologist and instructed to remain off work. *Id.* On January 5, 2021, Sowash texted Scott, asking him what was going on. *Id.* Scott answered his text, indicated he had to get an x-ray, see a pulmonologist, and after the results came back, he had to go back to his doctor. *Id.* Also, he told Sowash he would give him a doctor's note the next day. *Id.*

True to his word, on January 6, 2021, Scott sent Sowash a doctors note dated January 4, 2021, stating he was evaluated on the 4th, he should remain off work due to ongoing COVID symptoms, and was being referred to a lung specialist. [*Id.* at 9.] The next day, Defendant Lake Station sent a letter to Scott stating the city could not accept the note from the nurse practitioner since she was not his attending physician. *Id.* The city requested that Scott provide documentation including diagnosis and a recommendation from his attending physician as soon as possible. *Id.* Per the request, Scott obtained the physician's signature on the same note, and provided it to Lake Station. *Id.* Scott alleges that he contacted Stigger regarding the letter he received and the city fighting unemployment, but she did not respond. *Id.*

On January 11, 2021, Sowash texted Scott for an update, inquiring when he would go back to the doctor. [*Id.* at 9-10.] Scott responded that he had an appointment scheduled for February 3rd with the pulmonologist and would see his doctor after that. [*Id.* at 10.] Sowash responded, "OK cool." *Id.*

On February 3, 2021, Scott saw Dr. Giovanni Infusino, a pulmonologist, who provided a note stating he saw Scott that day and "should you have any questions you can contact our office at anytime." *Id.* The next day, on February 4th, Sowash texted Scott asking him when he was coming back to work. *Id.* Scott responded that he would return when he is better and gets released by his doctors. *Id.* Sowash then told Scott he needed to see him in person, and Scott should bring all of his paperwork. *Id.* Scott then texted that he had already sent all of the notes to Sowash. *Id.* Sowash then texted, "I

7

received everything in a text but regardless I need to see you Monday to go over everything and bring all the paperwork you have thanks." *Id.* Scott then asked why couldn't they meet after he returned to work, and in the meantime, his mother could bring the notes since he was sick. *Id.* Sowash then insisted upon Scott coming in person to see him on February 8th, stating he did not "think it is asking a lot . . . it has been 85 days since you have been off work there are some things we need to go over." [*Id.* at 11.]

On February 8, 2021, Sowash texted Scott, asking what time he could expect him in the office today. *Id.* Scott responded that he was still sick from COVID and did not feel comfortable coming in, but he would have his parents bring the notes the next day and asked Sowash if he would like to call him. *Id.* Sowash then stated, "I don't need your parents to come in. Since you are not coming in we will make other arrangements. That's all I needed to know." *Id.* Scott responded that he thought Sowash really needed the notes. Sowash replied, "[t]hat's fine I see how this is going to go . . . you're not going to show." *Id.* Scott alleges that at no time did Sowash indicate this was a board of works hearing or any other type of mandatory hearing. *Id.* Scott then asked Sowash in the next text if he was fired. *Id.* Sowash did not respond. Sowash then ceased all of his contact with Scott. *Id.* Neither Sowash nor anyone else from Lake Station contacted Scott from February 8, 2021 through February 23, 2021. [*Id.* at 12.]

Scott received a termination letter from Lake Station mayor, William Carroll, on February 23, 2021. *Id.* The letter indicates that several attempts were made to contact

Scott regarding his time off, and that Scott failed to attend a meeting on February 8, 2020, which was set up with the Superintendent of Public Works.  *Id.*  The letter also states Scott's failure to appear "shows complete lack of concern about your employment with the city" and states "[w]e are unable to keep your position open any longer due to your disrespect to the city management personnel and procedures."  *Id.*  Finally, Mayor Carroll's letter states that the only doctor's note they had was dated January 4, 2021.  *Id.*

A few days later, Scott contacted Stigger for guidance from the Union about his termination, but she never responded. [*Id.* at 14.]  Scott also contacted Cory Davis, a vice president of the union, who advised him to contact his union steward to file a grievance. [*Id.* at 14.]  While Scott did contact Davis, there are no allegations in the complaint that Scott actually ever filed a grievance.

On March 8, 2021, Sowash texted Scott and asked him if he wanted to resign from employment with the City, instead of a termination showing up on his employment history. [*Id.* at 26.]  Scott characterizes this as a "trick," offering Scott the ability to tender a resignation so not to tarnish his employment record, but presumably in reality so that Defendants could change their records to avoid liability for termination.  [*Id.* at 27.]

The Collective Bargaining Agreement between Local 3369 and the City of Lake Station contains a provision entitled "MEDICAL LEAVE" which states: "[m]edical or personal leave, without pay, may be granted by the Superintendent or his nominee to an Employee for a period of time not exceeding twelve [12] months if the Employee

demonstrates a reasonable likelihood of recovery and return to work within that time frame." [*Id.* at 15.]  Scott alleges that the Union Defendants breached this provision of the CBA and violated the duty of fair representation under the NLRA by failing to assist him and failing to file a grievance on his behalf. [*Id.* at 25.]  He brings several other claims against the City Defendants, including retaliatory discharge and intentional inflection of emotional distress.  As I mentioned before, there are twelve total claims in the second amended complaint.[1]

The Union Defendants have (somewhat confusingly) styled their motion to dismiss the claims against them pursuant to Rule 12(b)(1) and/or 12(h)(3), and for judgment on the pleadings pursuant to Rule 12(c). [DE 43.]  The Union Defendants attack Counts I-IV (the FMLA, FFCRA, and FLSA counts) under Rule 12(b)(1) and 12(h) (which provides that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action"), asserting Plaintiff lacks standing.  Fed. R. Civ. P. 12(h)(3). The 12(c) motion asserts that Scott has failed to state a claim against the Union Defendants on all counts asserted against them.

The City Defendants have, much more straightforwardly, moved to dismiss Counts VII, IX, and X of the second amended complaint pursuant to Rule 12(b)(6).

---

[1] There is a typographical error in the second amended complaint – there are two counts labeled as "Count X." [DE 37 at 26-27.] Therefore, I'll consider the constructive discharge count to be Count X, the discrimination in violation of the ADA against Defendants Lake Station, Carroll, Sowash, and Vera, to be Count XI, and the claim for violation of the ADA for failure to accommodate against Defendants Lake Station, Carroll, Sowash, and Vera, as Count XII.

**Discussion**

Because of the way the defendants have styled their motions, a few standards are applicable. A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) "is reviewed under the same standard as a motion to dismiss under 12(b) . . . ." *Flenner v. Sheahan*, 107 F.3d 459, 461 (7th Cir. 1997); *see also R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Local Union 150*, 335 F.3d 643, 647 (7th Cir. 2003). Where a party moves for judgment on the pleadings, "the motion should not be granted unless it appears beyond doubt that the non-moving party cannot prove facts sufficient to support his position." *Housing Auth. Risk Retention Group, Inc. v. Chicago Housing Auth.*, 378 F.3d 596, 600 (7th Cir. 2004) (quotation omitted). In ruling on a motion for judgment on the pleadings, the court must accept as true "all well-pleaded allegations" and view them in the light most favorable to the nonmoving party, as well as accept as true all reasonable inferences to be drawn from the allegations. *R.J. Corman*, 335 F.3d at 647; *see also Forseth v. Village of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000).

In order to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While I must accept all factual allegations as true and draw all reasonable inferences in the complainant's favor, I don't need to accept threadbare legal conclusions supported by

11

purely conclusory statements.  *See Iqbal*, 556 U.S. at 678.  Scott must allege "more than

labels and conclusions, and a formulaic recitation of the elements of a cause of action

will not do." *Twombly*, 550 U.S. at 555.  Making the plausibility determination is "a

context-specific task that requires the reviewing court to draw on its judicial experience

and common sense." *Iqbal*, 556 U.S. at 679.  Finally, "a motion to dismiss under Federal

Rule of Civil Procedure 12(b)(6) 'tests the sufficiency of the complaint, not the merits of

the case.'" *Tarzian v. Kraft Heinz Foods Co.*, No. 18 C 7148, 2019 WL 5064732, at *2 (N.D.

Ill. Oct. 9, 2019) (quoting *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 878 (7th Cir.

2012)).

## I.      Union Defendants' Motion to Dismiss/Judgment on the Pleadings

### A.      FMLA, FFCRA, FLSA Claims

Counts I-IV of the second amended complaint state claims under the Family

Medical Leave Act (FMLA), the Families First Coronavirus Response Act (FFCRA), and

the Fair Labor Standards Act (FLSA).  [DE 37 at 17-21.] The Union Defendants argue

these claims should be dismissed for a failure to state a claim for multiple reasons,

including these statutes only provide a cause of action to an employee against his

"employer." *See Runnion v. Girl Scouts of Greater Chicago and NW Indiana*, 786 F.3d 510,

517 (7th Cir. 2015).  The Union Defendants contend (and they support this contention

with a lot of caselaw in their memorandum), that they are not Scott's employer within

the meaning of the FMLA, FFCRA, or FLSA; therefore, these claims must be dismissed.

In response, Scott concedes dismissal of Counts I-IV against the Union

Defendants. [DE 51 at 1-2.]  However, he requests that the dismissal be *without* prejudice, and that he be granted leave to amend, pending additional discovery.  Scott posits that even though the Union Defendants may not meet the common definition of "employer" under the relevant statutes, they could have been acting "directly or indirectly, in the interest of an employer to any of the employees of such employer" within the meaning of the statutes.[2] [*Id.* at 2.]  Scott's theory is the Union was acting in the interest of Lake Station, not in Scott's interest; therefore, it fits under these statutes because it was acting in the interest of an employer.

Scott's theory that the Union was acting indirectly in the interest of the employer is worrisome when considered against case law.  Regarding the FMLA, in *Eckert v. United Auto. Workers, Local Union 897*, No. 04-CV-538S, 2005 WL 2126295, at * 9 (W.D.N.Y. 2005) (emphasis in original), the court tackled a similar argument that the union was in collusion with the employer, and still found the union was not an "employer" under the FMLA, noting "[s]uch a conclusion is consistent with the construction of other federal employment statutes.  Other statutes that permit actions

---

[2] The FMLA defines an employer as including "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer."  29 U.S.C. § 2611(4)(A)(ii)(I).  The Emergency Paid Sick Leave Act under the FFCRA, similarly provides that a covered employer is "any person acting directly or indirectly in the interest of an employer in relation to an employee (within the meaning of such phrase in section 3(d) of the Fair Labor Standards Act of 1938.)" Pub. L. No. 116-127 § 5110(2)(B)(i)(II)(aa).  Section 3(d) of the FLSA generally excludes unions and their agents from its definition of employer.  29 U.S.C. § 203(d) ("'Employer' . . . does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization.").

against labor organizations do so not by including unions within the definition of employer, but by specifically providing for suits against labor organizations *in addition* to suits against employers."

It is also somewhat troublesome that the FFCRA expired on December 31, 2020, almost two months *before* Scott was terminated. Pub. L. No. 116-127, § 5109. I suppose it is possible that Scott experienced adverse employment actions prior to his termination, and that retaliation could still be actionable, but the parties have not fully set forth the law for me on this novel statute.

Setting aside the problems in the second amended complaint with regard to the claims under these statutes against the Union Defendants, I do recognize that the Seventh Circuit has instructed when a plaintiff's complaint is dismissed, the general rule is to give at least one opportunity to amend the complaint to cure the pleading defects. *Runnion*, 786 F.3d at 519; *see also Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 690 (7th Cir. 2004) (reversing denial of leave to amend, and stating that leave to amend should be denied only where "it appears to a certainty that the plaintiff cannot state a claim upon which relief can be granted.").

For the reasons shown above, I am extremely dubious that additional discovery will be enough for Scott to state proper claims under these statutes which are really aimed at traditional employers, and not against Unions. However, hypothetically, there could be a scenario where discovery could uncover evidence (like collusive e-mails between members of the Union and Scott's employer trying to get rid of Scott), which

could possibly call into question whether the Union was acting indirectly in the interest of the employer.  However, I want to emphasize that if Scott chooses to attempt to file a third amended complaint, he must do it by filing a motion for leave to file together with the proposed third amended complaint.  *See* Fed. R. Civ. P. 15(a)(2).

### B. Retaliatory Discharge Claims

Counts V and VI of the second amended complaint assert claims for retaliatory discharge in violation of public policy and retaliation for filing unemployment. [DE 37 at 22-24.]  The Union Defendants argue they should be dismissed under Rule 12(c) for failure to state a claim upon which relief may be granted because Indiana law does not recognize these claims.

In response, Scott concedes that dismissal of Counts V and VI is appropriate, but again requests that these counts be dismissed *without prejudice*. [DE 51 at 4-5.]  I'm dubious of this tact.  As with the other claims discussed above, Scott concedes these counts should be dismissed after the Union Defendants have provided pages of legal argument with case citations about why these claims fail, but then Scott requests that the dismissal be without prejudice.  And, once again, there are some obvious concerns with these claims.

Scott alleges the Union Defendants retaliated against him because he was fired for declining Sowash's request that he come to work on February 8, 2021, while he was still sick with COVID, and that this violated the CARES Act and OSHA, and contravened public policy. [DE 37 at 22-23.] The Union Defendants argue that even if

15

Scott went into work for that meeting, he would not have been subject to personal liability. More on point, and concerning for Scott, I think, is their argument that Scott has not alleged that the Union Defendants played any role in his termination, or had the authority to discharge him, or played any part at all in the discharge. Finally, in relation to Count VI, the Union Defendants provide caselaw that Indiana only recognizes a cause of action for retaliatory discharge in violation of public policy when the employee is allegedly discharged for filing a workmen's compensation claim (and not unemployment benefits, like in this case). However, as pointed out by Scott, pandemic-related relief is new, and as far as I am aware, retaliation for exercising rights related to benefits for those affected by COVID have not been addressed by the courts yet. Also, there is the possibility that discovery could potentially uncover facts calling into question whether the Union somehow played a part in Scott's termination.

Therefore, as I did with the first few counts in this case, I will dismiss the retaliatory discharge claims (Counts V and VI) without prejudice. I remain skeptical that any discovery will change the viability of these claims. So, as with the earlier claims, if Scott chooses to make an effort to file a third amended complaint, he must do so by filing a motion for leave to file together with the proposed third amended complaint.

### C.    NLRA/LMRA Claims

The Union Defendants claim that Counts VII (for violation of the NLRA) and Count VIII (for violation of the LMRA) should also be dismissed. They tell me that

16

there is no "subject matter jurisdiction" over these claims, but this argument demonstrates a misunderstanding of the difference between jurisdiction on the one hand, and failure to state a claim on the other. *See Morrison v. YTB, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011) ("subject-matter jurisdiction is a synonym for adjudicatory competence. A federal court is the wrong forum when there is no case or controversy, or when Congress has not authorized it to resolve a particular kind of dispute. Other deficiencies in a plaintiff's claim concern the merits rather than subject-matter jurisdiction."). So I think the Union's argument misses the mark. But it matters not, because the counts must be dismissed anyway because a plain reading of the involved statutes make it clear there are no grounds for relief in this context.

Count VII alleges a violation of the CBA by not granting up to twelve months of medical leave and Count VIII alleges a "breach of the duty of fair representation pursuant to the National Labor Relations Act" by ignoring [Scott's] request for assistance" and failing to file a grievance on his behalf or to assist him. [DE 37 at 25.] These allegations set forth a "hybrid § 301 claim," arising under Section 301 of the LMRA, 29 U.S.C. § 185; *see DelCostello v. Int'l Bhd. Of Teamsters*, 462 U.S. 151, 164-65 (1983). This hybrid suit contains two separate causes of action - breach of contract and breach of the duty of fair representation. To prevail on either claim, Scott must prevail on both. *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1241 (7th Cir. 1997); *UPS v. Mitchell*, 451 U.S. 56, 62 (1981) ("To prevail against either the company or the Union, petitioners must not only show that their discharge was contrary to the contract but

must also carry the burden of demonstrating breach of duty by the Union."); *DelCostello*, 462 U.S. at 165 ("The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both."). Scott does not dispute that his claims arise under section 301, and embraces that section, setting forth its qualifications. [DE 51 at 7-8.]

The Union Defendants claim this court lacks subject matter jurisdiction over this hybrid section 301 claim. In support, it cites *Healy v. Metro. Pier and Exposition Auth.*, 804 F.3d 836 (7th Cir. 2015). In *Healy*, the Seventh Circuit very specifically affirmed the district court's finding that the MPEA was a political subdivision, and therefore immune from federal claims arising under § 301. It explained:

> Section 301(a) grants federal courts jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185(a). That is, the provision grants federal courts jurisdiction over controversies surrounding labor organizations and, by extension, the violation of collective bargaining agreements. *Textile Workers Union of America v. Lincoln Mills of Ala.*, 353 U.S. 448, 450-51 (1957). However, the LMRA definition of "employer" expressly excludes "any State or political subdivision thereof." 29 U.S.C. § 152(2). So, even though a state or political subdivision may sign and be a party to a collective bargaining agreement, it remains immune from federal lawsuits arising under the collective bargaining agreement and relevant federal law. . . . As a political subdivision, MPEA is not an "employer" under LMRA. 29 U.C. § 152(2). Because the MPEA is not an employer, it cannot be sued under § 301. *See* 29 U.S.C. § 185(a).

*Id.* at 841. Because the MPEA was a political subdivision, it was not an "employer" under the LMRA, and could not be sued under section 301. Therefore, the Court

affirmed the dismissal. The *Healy* court did not directly address whether the claims should have been dismissed for lack of subject matter jurisdiction; rather, it used words like the political subdivision was "immune" from suit and it "cannot be sued under § 301." *Id.*

A similar result was reached in *Rogers v. Amalgamated Transit Union Local 682*, No. 1:16-cv-284, 2017 WL 4539922, at *5 (N.D. Ind. Oct. 11, 2017), where the court dismissed a § 301 claim against the Will County Sheriff's Office (that it breached the CBA) and the union (that it breached the duty of fair representation), finding "[a]n LMRA suit by a public employee against her public employer should be dismissed for lack of subject matter jurisdiction." *Rogers* cites numerous cases from around the country finding the same conclusion that a section 301 suit against a state or political subdivision is improper. *Id.*

In *Okoro v. Cook Cnty. Health & Hosp. Sys.*, No. 19-cv-06061, 2021 WL 2413152, at *3 (N.D. Ill. June 14, 2021), the court reached the same conclusion and dismissed section 301 claims against a union. It had a similar rationale, citing *Healy*, and finding that because the plaintiff's employer was Cook County, a political subdivision, "the Court lacks jurisdiction over [plaintiff's] § 301 claim against Local 73." *Id.* (citing *Kirsch v. AFSCME Loc. 2645*, No. 01 C 6078, 2001 WL 1593140, at *1 (N.D. Ill. Dec. 31, 2001) ("[I]t follows from the fact that a state-government employee cannot sue her employer under the LMRA for breach of a collective bargaining agreement that she cannot sue her union for failing to represent her adequately in her claim against the employer for breach of

the agreement.")).

In this case, it is not disputed that the City of Lake Station is a political subdivision, and the caselaw is directly on point that the statute specifically excludes these types of section 301 claims against the Union. Scott's argument that I must have jurisdiction over a public employee's claim over a union, otherwise, they would have no recourse against the union, is conclusory and unsupported. [DE 51 at 8-9.]

I am cognizant that other courts around the country have dismissed such claims for lack of subject matter jurisdiction. *See, e.g., Ford v. D.C. 37 Union Local 1549*, 579 F.3d 187, 188 (2d Cir. 2009)*; Nobles v. Metro. Transit Auth.*, 15 F.3d 179, 1994 WL 24874, at *4-5 (5th Cir. 1994); *Manfredi v, Hazleton City Auth., Water Dep't*, 793 F.2d 101 (3d Cir. 1986); *Ayers v. Int'l Bhd. Of Elec. Workers*, 666 F.2d 441 (9th Cir. 1982); *Bailey v. Johnson*, No. 90 C 01795, 1990 WL 77508, at *2 (N.D. Ill. May 30, 1990). However, there is no Seventh Circuit case directly on point, and respectfully, I disagree with this end conclusion that claims like these should be dismissed for lack of subject matter jurisdiction. Rather, for the reasons articulated by the Seventh Circuit in *Morrison*, 649 F.3d at 536, where the court distinguishes between the power to decide a particular dispute, and whether the instant plaintiff actually has a valid claim that fits within the relevant statute, I think these claims should be dismissed for failure to state a claim. The Union Defendants are specifically excluded from the definition of employers for which Scott may state a hybrid section 301 claim. Therefore, I'll dismiss these claims on the merits for failure to state a claim.

20

Because Scott has failed to state legally viable claims under section 301 against the Union Defendants, nothing that could possibly be uncovered later during discovery in this case could save these claims. Since any amendment of these counts would be futile, they will be dismissed with prejudice. *See Tribble v. Evangelides*, 670 F.3d 753, 761 (7th Cir. 2012) ("District courts have broad discretion to deny leave to amend . . . where the amendment would be futile.").

To summarize: all claims against the Union Defendants are dismissed. Counts I-VI will be dismissed without prejudice and Counts VII and VIII will be dismissed with prejudice.

## II.     The City Defendants

The City Defendants have moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim, the following counts of the second amended complaint: Count VII (breach of the CBA), Count IX (intentional infliction of emotional distress), and Count X (constructive discharge).

Before continuing, I would be remiss if I didn't address the fact that I just dismissed Count VII against the Union Defendants for failure to state a claim. Arguably, a similar rationale that the City Defendants are immune from suit under § 301 would apply towards Count VII against the City Defendants (and probably Count X which also seems to be a § 301 claim). However, the City Defendants did *not* set forth such arguments in their motion to dismiss. Can I just go ahead and dismiss Count VII against the City Defendants too since the same rationale would apply? I think the

21

answer is a cautious no, because Scott was not on notice that this argument might apply to the City Defendants too, and had no opportunity to brief this issue (because, of course, it wasn't raised by the City Defendants).  *See, e.g., Pourghoraishi v. Flying J.*, 449 F.3d 751, 765 (7th Cir. 2006) (finding district court erred in dismissing claims against other defendants that did not file a motion for summary judgment, reasoning "a court cannot sua sponte enter summary judgment or dismiss a complaint without notifying the parties of its intentions and allowing them an opportunity to cure the defect in the complaint or to respond.").  This is a closer case here than in *Pourghoraishi*, because the City Defendants did file a motion to dismiss (just on different grounds), and technically Scott had an opportunity to respond (just to the Union Defendants' arguments only, though).  In an abundance of caution, I think it is best to analyze the arguments that the City Defendants put before me.  Of course, if the City Defendants later decide to file a motion for summary judgment on this basis, that is their prerogative.

### A.    Breach of CBA and Constructive Discharge Claims

The City Defendants argue that Scott's failure to exhaust his administrative remedies (by failing to utilize the grievance and arbitration procedure set forth in the CBA), bars these claims.  In response, Scott argues that failure to exhaust administrative remedies is a defense — and not an appropriate basis on which to rely to dismiss claims.[3]  Additionally, Scott claims the court has discretion in excusing a failure to

---

[3] Scott mentions this argument in passing in a subtitle [DE 52 at 2] but does not elaborate, or provide any case law in support.  Instead, he jumps into arguing the exhaustion of remedies should be excused in this case.  However, I will deal with this

exhaust.

In Count VII, Scott alleges the CBA contains a provision permitting employees to take an unpaid medical leave of absence of up to one year, and also claims that because such leave was never made available to him, the City Defendants violated the CBA. Count X alleges that Scott was constructively discharged from the City—in the March 8, 2021 text, Sowash asked Scott if he wanted to resign from his employment instead of a termination appearing on his employment history. Scott characterizes this as either a trick so that Defendants could change their records to avoid liability for termination or "[a]lternatively, this threat of termination made working conditions so intolerable, in addition to the harassment and discrimination, that a reasonable person would not and could not return to the position, amounting to constructive discharge." [DE 37 at 27.]

Claims for breach of a CBA are governed by Section 301 of the LMRA, 29 U.S.C. § 185. "Where, as is true of more than 90 percent of such contracts, the [CBA] establishes a grievance and arbitration remedy, that remedy becomes by force of section 301 exclusive." *Stafford v. Faurecia Emissions Control Techs. USA, LLC*, 2020 WL 805790, at *1 (N.D. Ind. Feb. 18, 2020) (quoting *Lancaster v. Norfolk and W. Ry. Co.*, 773 F.2d 807, 816 (7th Cir. 1985)). Case law is clear that "[a]n employee seeking a remedy for an alleged breach of the collective-bargaining agreement between his union and employer must attempt to exhaust any exclusive grievance and arbitration procedures established by

_____

notion of exhaustion as an affirmative defense later in this opinion, because it does bear on this motion.

that agreement before he may maintain a suit against his union or employer under §

301(a) of the Labor Management Relations Act." *Clayton v. Int'l Union, United Auto.,*

*Aerospace and Agric. Implement Workers of Amer.*, 451 U.S. 679, 681 (1981).

Here, the CBA provides if an employee complaint is not settled, it should be

reduced to writing and submitted to the Superintendent within 15 days, and then

answered within 5.[4] [DE 9-1 at 11.]  The CBA goes on to provide that if the answer of the

Superintendent is not satisfactory to the employee, the complaint should be submitted

to the Board of Public Works and Safety, which should schedule an executive session to

deal with the matter. *Id.*  Then, if the disposition of the Board of Public Works and

Safety is not satisfactory to the employee, the employee may request in writing

arbitration of the claim.  *Id.* at 12.  However, the second amended complaint is glaringly

bare of any allegations that Scott initiated any grievance or arbitration proceedings.

Of course, "ignorance of one's internal union remedies does not excuse the

failure to pursue such remedies before bringing suit."  *Bell v. DaimlerChrysler Corp.*, 547

F.3d 796, 809 (7th Cir. 2008).  The Seventh Circuit has held that union members have an

obligation of diligence in ascertaining what avenues of relief are available to them

within the union.  *Hammer v. Int'l Union, United Auto., Aerospace & Agric. Implement*

*Workers of Am.*, 178 F.3d 856, 858 (7th Cir. 1999).

---

[4] The CBA is referenced in paragraph 11 of the second amended complaint,
which states it is attached as Exhibit A. [DE 37 at 3.] However, the CBA is only attached
to the amended complaint (it is not attached to the second amended complaint). [DE 9-
1.] This seems to be an oversight, and because the parties reference this document, I
think it is fair game for me to consider it too.

In response, Scott argues that I have discretion to decide whether I should require exhaustion in this instance. Scott cites to *Bassett v. Local Union No. 75, Int'l Brothers of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, 773 F.2d 932, 935 (7th Cir. 1985), which states that "courts have discretion to decide whether to require exhaustion of internal union procedures." In doing so, it was applying the opinion of *Clayton*, which held that the court may exercise discretion and:

> at least three factors should be relevant: first, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks under § 301; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim.

*Clayton*, 451 U.S. at 689. I'll add that the courts have found these *Clayton* factors are not exclusive, and "[i]n fact, in considering whether exhaustion was required, a court must look to the reasonableness of imposing it under the circumstances of the situation." *Lewis v. Local Union No. 100 of the Laborers' Int'l Union of N. Am., AFL-CIO*, 750 F.2d 1368, 1380 (7th Cir. 1984). To further muddle things, the Seventh Circuit has conceded that "there is nothing clear-cut about the factors that will excuse exhaustion." *Frandsen v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Express & Station Emps.*, 782 F.2d 674, 682 (7th Cir. 1986). Rather, I'm just supposed to exercise my discretion in determining whether Scott needed to fully exhaust his internal procedures before seeking relief in this court. *Fulk v. United Transp. Union*, 108 F.3d 113, 117 (7th Cir. 1997).

In their reply, the City Defendants argue that none of the *Clayton* factors are

present here. [DE 54 at 5.]  They contend that the Union was not "so hostile" that Scott

could not hope to obtain a fair hearing on his claim, pointing to the many allegations in

the second amended complaint that the Union failed to respond to Scott's requests, but

highlighting that *inaction* is not the same thing as *hostility*.  They also assert that Scott's

claims were not so novel or unique that they could not be resolved through a grievance

or arbitration process.  And finally, the grievance procedure would not have created

unreasonable delay because, by the terms of the CBA, the grievance and appeal

procedure would have been completed within 60 days.

Scott urges I use my discretion to find that the exhaustion requirement is waived.

[DE 52 at 4-5.]  He argues he continually had his Union representative in the loop and

sought help from them, there were many written communications to his supervisor

(Sowash) and the Union representative (Stigger); nonetheless, the Union and Stigger

totally ignored Scott's communications and his requests for help.  Further, Scott points

out that he was very ill during all of this time.  He also claims that a union setting could

not provide him the relief he was seeking since his claims were novel and complicated,

and he could not wait.  Scott insists under these circumstances "it would have been

entirely unreasonable for him to exhaust administrative remedies - delaying any type of

analysis of the true merits of his case." [DE 52 at 5.]

Of course, it is awkward to apply the *Clayton* analysis to this case, or decide if I

should use my discretion to excuse exhaustion.  How do I decide if the union

procedures could grant Scott full relief, when he apparently never actually filed a

26

grievance?  Would he have requested not to be terminated, or reinstated? Could the union have been able to grant such relief, or would their internal procedures not be adequate to effect such relief?  Again, this is all speculative – as the second amended complaint does not include any allegations about Scott filing any grievance at all.  But at this stage of the litigation, on a motion to dismiss, when I can only consider the allegations in the complaint, I have nothing to look at showing me why Scott apparently did not file a grievance.  There are, however, allegations in the complaint that the Union continually ignored Scott's outreach for assistance. But without further discovery, it is difficult to fully analyze the Union's actions (and whether they could be considered hostile), or consider whether the union procedures could have given Scott full relief.

Ultimately, I'm reluctant to dispose of these claims on a motion to dismiss.  I note that most cases in our circuit that have dealt with the issue of exhaustion of a section 301 claim have done so on a motion for summary judgment.  *See, e.g., Bell*, 547 F.3d 796; *Hammer*, 178 F.3d 856; *Fulk*, 108 F.3d 113; *Tinsley v. UPS*, 665 F.2d 778 (7th Cir. 1981); *Vavrek v. Int'l Union, United Auto., Aerospace and Agr. Implement Workers, UAW*, No. 3:11-CV-00498-WCL-CAN, 2013 WL 4090931 (N.D. Ind. Aug. 13. 2013). Perhaps most importantly, the failure to exhaust administrative remedies under these circumstances is an affirmative defense.  *See, e.g., Mosely v. Bd. of Educ.*, 434 F.3d 527, 533 (7th Cir. 2006) ("A failure to exhaust is normally considered to be an affirmative defense."); *Vaca v. Sipes*, 386 U.S. 171, 184 (1967) ("if the wrongfully discharged employee himself resorts

27

to the courts before the grievance procedures have been fully exhausted, the employer may well defend on the ground that the exclusive remedies provided by such a contract have not been exhausted.").  And affirmative defenses normally do not need to be anticipated or negated in a complaint. A motion to dismiss is usually only granted if a plaintiff pleads facts that show his claim is barred by the affirmative defense.  *See, e.g., Tregenza v. Great Am. Commc'ns Co.*, 12 F.3d 717, 718-19 (7th Cir. 1993) ("A complaint that on its face reveals that the plaintiff's claim is barred by a statute of limitations . . . can be dismissed on a motion to dismiss.").

Here, Scott did not plead facts that show he did not exhaust his administrative remedies.  The second amended complaint is silent on this basis.  Indeed, the City Defendants argue that "Scott has not alleged that he even attempted to exhaust the grievance and arbitration procedures established by the Agreement." [DE 45 at 5.]  In other words, the face of the complaint does not establish that Scott failed to exhaust his administrative remedies — it does not include any allegations about this at all. Therefore, the City Defendants' motion to dismiss counts VII and X is denied.

### B.    Intentional Infliction of Emotional Distress

The City Defendants assert Count IX (intentional infliction of emotional distress) should be dismissed because "Scott has failed to allege that he complied with the requirements of the Indiana Tort Claims Act by providing notice to the City Defendants." [DE 45 at 5.]   Under the ITCA, a claim against a political subdivision is barred unless notice is filed with: (1) the governing body of that political subdivision,

28

and (2) the Indiana political subdivision risk management commission within 180 days

after the loss occurs.  Ind. Code § 34-13-3-8.

Following the familiar theme, Scott argues that alleging he provided a tort notice

"is not a part of a prima facie case for IIED" and "[f]ailure to provide such notice may

be a defense to such a claim, but has absolutely nothing to do with properly stating the

claim." [DE 52 at 8.]  Scott cites no case law in support of this proposition.

Once again, Scott does not admit in the second amended complaint that he did

not comply with the requirements of the ITCA, the City Defendants just point to his

failure *to allege* he provided the requisite notice to the City Defendants for his tort claim.

Scott argues in his memorandum that his counsel had multiple contacts with Mayor

Carroll and the city counsel, and provided them with a number of documents, and this

should have provided sufficient notice. [DE 52 at 8.]  Also, he argues that if need be, it

has not been 180 days since the incidents at hand, and he could always still provide a

tort notice.  *Id.*

This exact same dilemma was already faced by our court in *Adams v. Traylor-

Wolff*, No. 2:11 CV 365, 2012 WL 3061837, at *2 (N.D. Ind. July 25, 2012), where the

plaintiff's complaint did not contain facts regarding whether or not he provided the

defendant with the appropriate notice under the ITCA.  There, the court reasoned:

> [A]s plaintiff points out, a "complaint need not anticipate and
> attempt to plead around defenses."  *United States v. N. Trust Co.*,
> 372 F.3d 886, 888 (7th Cir. 2004).  True, "[a] litigant may plead itself
> out of court by alleging (and thus admitting) the ingredients of a
> defense," *U.S. Gypsum Co. v. Ind. Gas Co., Inc.*, 350 F.3d 623, 626 (7th
> Cir. 2003), but a plaintiff's omission of facts from his complaint

29

> which would ultimately defeat an affirmative defense does not
> justify dismissal. *Id.*; *Hollander v. Brown*, 457 F.3d 668, 691 n.1 (7th
> Cir. 2006).  Accordingly, plaintiff's silence on the ITCA in his
> complaint is not dispositive.

*Id.* at *2.  I agree with this logic, and this is consistent with my earlier ruling about the

failure to exhaust.  The factual scenario in this case and *Adams* is different than the case

cited by the City Defendants, *Bienz v. Bloom*, 674 N.E.2d 998, 1005 (Ind. Ct. App. 1996),

where the actual filed grievance was in front of the court, and the court found it was

proper to rule on a motion to dismiss that the grievance did not constitute substantial

compliance with the ITCA.  Again, in this case, I don't have enough facts in front of me

to decide whether Scott substantially complied with the notice requirement.

Of course, the City Defendants are welcome to raise this issue on a motion for

summary judgment, if they so choose (and that will be a better time to judge whether

Scott substantially complied with the notice or did provide proper notice to satisfy the

ITCA).

## Conclusion

For the aforementioned reasons, the Union Defendants' Motion to Dismiss [DE

43] is GRANTED as follows: Counts VII and VIII are dismissed as to the Union

Defendants WITH PREJUDICE; and Counts I-VI are dismissed as to the Union

Defendants WITHOUT PREJUDICE.  If Scott chooses to make an effort to file a third

amended complaint, he must do so by filing a motion for leave to file along with the

proposed third amended complaint.

The City Defendants' Motion to Dismiss [DE 45] is DENIED.

SO ORDERED.

ENTERED: January 31, 2022.

/s/   Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT